ORIGINAL



FILED

FEB - 9 2015

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

1   Ilangovan Kuppusamy
    Ranjani Ilangovan Krishnan
2   5371 Strasbourg Ave
    Irvine, CA 93604
3   (310) 897-7555
4
    Debtors
5

6

7                    UNITED STATES BANKRUPTCY COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

                          SANTA ANA DIVISION
9

10  In Re: Ilangovan Kuppusamy, and ) Case No. : 8:14-bk-17399-CB
                                     )
11  Ranjani Ilangovan Krishnan,      ) Chapter 7
                                     )
12           Debtors,                ) Filed: December 26, 2014
                                     )
13  _____)
    Richard A. Marshack, Chapter 7   ) **Response in Reply to Chapter 7**
14                                    )
    Trustee,                         ) **Trustee's Opposition to Motion**
15                                    )
             Plaintiff,              ) **to Dismiss Chapter 7 Case**
16  v.                               )
17                                    )
    Harikrishnan Kuppusamy           )
18                                    ) **Hearing Date: February 10, 2015**
    Krishnan,                        )
19                                    ) **Time: 2:30 PM**
             Defendant               )
20  _____ )
21
22          COME NOW, Debtors, and hereby reply to the Chapter 7 Trustee's
23  opposition to their motion to dismiss the Chapter 7 case.
24          1. In his affidavit, the Chapter 7 Trustee does not contradict
25              that he obtained confidential information of the Debtors
26              from Richard Heston via "back channel".  This is
27              significant.  Nor does the Chapter 7 Trustee contradict any
28

                                  - 1 -

facts supporting the motion to dismiss, namely, that Ms. Ilangovan Krishnan was overseas at the time the petition was filed, and that the schedules were not prepared before she boarded an international flight on December 21, 2014.

2. The Court is respectfully requested to take judicial notice of the requirement by international airlines that passengers arrive at the gate at least 2-3 hours before scheduled departure time, and that the traffic in Los Angeles to LAX requires an additional two hours of time, which makes it clear that she left home for the airport on that date about 9 AM.

3. The Chapter 7 Trustee once again alleges that the Colorado complaint was undisputed and that it was for $19 million.

4. The Chapter 7 Trustee, however, failed to attach the complaint or any contracts related to the complaint to his documents, which would have enabled this Court to make an independent determination of these allegations.

5. The Chapter 7 Trustee's only basis is that "debtors"—i.e., Gabriela Kent[1], a "secretary" with no legal knowledge, who

---

[1] Ms. Kent possibly violated 11 U.S.C. § 110. See, e.g., *In re Hessinger & Associates*, 192 B.R. 211 (U.S.D.C. N.D.Cal. 1996) (affirming a bankruptcy court's finding that a law firm failed to act competently in representing bankruptcy debtors to the extent that it allowed paralegals to complete bankruptcy petitions and schedules and to perform other work of legal character without adequate attorney supervision). See also, *McGregor v. State Bar of Cal.*, 24 Cal.2d 283 (1944)("The right to practice law not only

admits to have practiced law without a license or

supervision—did not check the box in the forms that the

claims are "disputed."

6. Notwithstanding the egregious fact that Mr. and Ms. Kent

   violated their duty of confidentiality to the Debtors,

   especially after being ordered not to disclose any

   information[2], it appears that Ms. Kent did not know that

   allegations in a complaint are not "judgments" is glaringly

   obvious.  It is clear that neither Ms. Kent nor Mr. Kent

   understood 11 U.S.C. § 727(a).

7. Completely ignoring the fact that the claims against debtors

   are unliquidated, contingent and disputed, the Chapter 7

   Trustee also alleges that the debtors did not show how they

   would handle the claims of about "$20 million" outside the

   bankruptcy forum.

---

presupposes in its possessor integrity, legal standing and
attainment, but also the exercise of a special privilege, highly
personal and partaking of the nature of a public trust. It is
manifest that the powers and privileges derived from it may not
with propriety be delegated to or exercised by a nonlicensed
person.")
    [2] The Court is requested to open a case under its inherent
powers to investigate the violation of Debtors' confidentiality by
Mr. Kent and others and why after being discharged and after being
ordered not to disclose client confidentiality, Mr. Kent filed his
affidavit, and if any person requested him to file the affidavit.
The Court is further requested to grant appropriate relief to
Debtors because neither Mr. Kent nor Ms. Kent has standing to
object to the Debtors' motion to dismiss.

8. However, the Chapter 7 Trustee fails to show how $415,000 would satisfy $20 million via this bankruptcy forum in light of his claim for "administrative fees" for "extensive" work, which would use up most of the alleged $415,000.

9. The Trustee's opposition does not make sensible economic argument that he is in fact acting either in the interests of the debtors or the interests of the creditors. This was the reason for discharging the Trustee.

### EQUITY REQUIRES DISMISSAL OF THIS CASE

10. There appears no precedent to a case such as this, where equity overrides any legal reason, including "plain legal prejudice" to creditors[3]. See In re Hall, 15 B.R. 913, 917 (9th Cir. BAP 1981) (citing Schroeder v. Int'l Airport Inn Partnership (In re Int'l Airport Inn Partnership), 517 F.2d 510, 512 (9th Cir.1975) (per curiam))(a voluntary Chapter 7 debtor is entitled to dismissal of his case so long as such dismissal will cause no "plain legal prejudice" to interested parties.)

11. Here, the debtors are obviously misled as to the need for filing bankruptcy or its consequences.

---

[3] Bankruptcy courts in other jurisdictions have other standards, such as "any prejudice" to creditors, and a "balancing of interests" weighing debtors' versus creditors' interests in granting dismissals of Chapter 7 cases. In the Ninth Circuit, the much stricter test is applied requiring a showing of "plain legal prejudice" to creditors.

12.  The process of preparing and filing the papers is upside-down.

13.  Debtors were misled by a "secretary" who put random numbers in the schedules.

14.  The Chapter 7 petition itself shows that Mr. Kent obtained money to file a petition on or about November 19, 2014, at a time when the correct thing to do would have been to hire local counsel to file a responsive pleading in the Colorado Court.

15.  In addition to the arbitration argument made in a prior filing, the Debtors informed the Chapter 7 Trustee that there are numerous other defenses to the Colorado case, including forum nonconveniens[4], personal jurisdiction, subject matter jurisdiction, and others.

16.  The Colorado case went into default without any action here.  And the petition shows that signatures were made on December 16, 2014, and one signature on December 17, 2014, which also, surprisingly states that money was paid to Mr. Kent on December 19, 2014.  The schedules were obviously not

---

[4] There are two recognized "threshold grounds" on which a court can resolve a case without addressing subject matter jurisdiction: (1) personal jurisdiction and (2) *forum non conveniens*. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999) ("Customarily, a federal court first resolves doubts about its jurisdiction over the subject matter, but there are circumstances in which a district court appropriately accords priority to a personal jurisdiction inquiry."); *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007)

prepared by the time these signatures were made on the

petition documents, which makes the petition being signed in

blank, for the essence of the petition is not filling in the

blanks in the forms, schedules and other documents with

uninformed numbers.

17.   Clearly, Ms. Kent was unable to comprehend a federal

civil complaint.

18.   She put $19 million where the claimants only alleged that

they incurred damages "in an amount to be proven at trial."

See Colorado Complaint, attached as Exhibit 1 to this paper,

at ¶¶ 37, 42, 50 & 53.

19.   While Ms. Kent's inability to comprehend a complaint is

understandable, the Chapter 7 Trustee's allegation that

Debtors have an undisputed debt of $19 million is not.   The

Chapter 7 Trustee should be required to explain how he

computed this amount in debt from the Colorado complaint,

which amount is the principal ground for his allegation of

prejudice to creditors.

20.   In addition, the Chapter 7 Trustee, who improperly relies

on Ms. Kent's "declaration" for the truth of the matter

therein, alleges that the debtors' signatures were

sufficient indication that they approved what was added

(district court had authority to dismiss action on *forum non
conveniens* grounds before considering the merits).

after the signatures were affixed to the documents.  The
Chapter 7 Trustee also appears to argue that e-mails from
the husband bound the wife to documents.  Implicit in this
argument by the Chapter 7 Trustee is that the schedule
preparer explained the nature and implication of the matters
stated therein.  These implications and insinuations do not
have the force of established facts.

21.  Clearly, nothing shows that Ms. Krishnan ever approved
the filing, and that Dr Kuppusamy did not know what was
filed in his name.  And Ms Kent is not legally qualified or
educated to understand and interpret the validity or amount
in any filing.

**DEBTORS DO NOT PLAN TO FILE ANOTHER BANKRUTPCY PETITION**

22.  The trustee's argument that the debtors might
"orchestrate an outcome whereby they are able to claim
homestead exemptions in the Property to the detriment of
existing creditor rights" is unsupported and unwarranted.
There being no reason to file a Chapter 7 in the first
place, Debtors do not plan to refile the petition.

**NO ADMINISTRATIVE FEES ARE JUSTIFIED IN THIS CASE**

23.  As to the administrative fee request by the Trustee, he
did not obtain permission of the court to appoint counsel,
and his assertion of having conducted "extensive" research
is flawed in that he continued to argue that the Colorado

complaint sought $19 million based only on schedules filed
by non-lawyer Ms. Kent, which does not support the claim of
extensive legal research.

24.  For the foregoing reasons, the Chapter 7 Trustee's
objection to the motion to dismiss should be overruled and
the motion should be sustained.

25.  If the Court were to sustain the motion to dismiss,
debtors request granting the motion *nunc pro tunc* coupled
with an order of expungement, and also in a manner not to
prejudice their filing responsive papers in the Colorado and
other litigations.


Respectfully submitted,


DATED: February 9, 2015      _____
                             Ilangovan Kupusamy, Debtor


DATED: February 9, 2015      _____
                             Ranjani Ilangovan Krishnan, Debtor

- 8 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

---

PRESLEY O. REED,
PATRICIA STACEY REED,
KMP MINING, LLC,
KMP MEXICO, LLC,
KMP INTERNATIONAL, LLC,
TRASTEEL BELGIUM SOCIÉTÉ ANONYME,
BELGIRON SA, and
TRASTEEL INTERNATIONAL S.A.,

Plaintiffs,

v.

ILANGOVAN AMMAL KUPPUSAMY,
RANJANI ILANGOVAN KRISHMAN, AND
IRK INTERNATIONAL S.A. de C.V.

Defendants.

---

## COMPLAINT

---

1.    Plaintiffs, Presley O. Reed, Patricia Stacey Reed, KMP Mining, LLC,

KMP Mexico, LLC, Trasteel Belgium Société Anonyme, Belgiron SA and Trasteel International

S.A. (the "Plaintiffs"), by and through their undersigned counsel, Peter B. Nagel, P.C., alleges as

their Complaint against the Defendants as follows:

### PARTIES

2.    Presley O. Reed ("Dr. Reed") and Patricia Stacey Reed ("Mrs. Reed") are

Ex — 1

residents of the State of Colorado and have as their principal place of business 375 Bellevue Drive, Boulder, Colorado 80302.

     3.     KMP Mexico, LLC is a Delaware limited liability company whose sole member and manager is Mrs. Reed.

     4.     KMP Mining, LLC is a Delaware limited liability company whose sole member is Dr. Reed.

     5.     KMP International, LLC is a Delaware limited liability company whose sole members are Dr. and Mrs. Reed.

     6.     Trasteel Belgium Société Anonyme is a Belgium Société Anonyme en liquidation having its principal place of business at Boulevard Du Souverain 90, 1170 Bruxelles, Belgium.

     7.     Belgiron SA is a Belgium company Société Anonyme en liquidation having its principal place of business at Avenue de Petit-Rouelx 1, 7181 Arquennes, Belgium

     8.     Trasteel International S.A. is a Swiss Société Anonyme having its principal place of business at via Pelli 12, 6900 Lugano, Switzerland.

     9.     IRK International S.A. de C.V. is a Mexican Sociedad Anónima de Capital Variable that no longer has a principal place of business.

     10.     On information and belief, Ilangovan Ammal Kuppusamy ("Dr. Kuppusamy") and Ranjani Ilangovan Krishman ("Mrs. Kuppusamy") are husband and wife, citizens of India, and maintain a residence in the United States at 5371 Strasbourg Avenue, Irvine, California 92604.

## JURISDICTION AND VENUE

11.     This court has jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

12.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

13.     Following the events, described below, that form the basis of the Plaintiffs' complaint against the Defendants, the Defendants purposely terminated all communications with the Plaintiffs, relocated their personal residence from Mexico to the United States without informing the Plaintiffs of that relocation, and deliberately concealed their whereabouts from the Plaintiffs. Only recently were the Plaintiffs able, through the exercise of reasonable diligence and the services of a private investigator, to determine the location of the Defendants' place of residence.

## FACTUAL BACKGROUND

14.     On June 8, 2004, Dr. and Mrs. Kuppusamy formed a Mexican corporation known as "IRK International, SA de CV" ("IRK").

*Investments in IRK Made by Dr. and Mrs. Reed*

15.     In 2008, a business associate of Dr. Reed's introduced Dr. Reed to Dr. Kuppusamy, who represented himself to Dr. Reed as the chairman and chief executive officer of IRK.

16.     On April 28, 2009 and at least one other occasion, Dr. Kuppusamy travelled to Boulder, Colorado, where he met in person with Dr. Reed to discuss matters relating

- 3 -

to Dr. Reed's investment in IRK.

17.     Between October of 2008 and November of 2009, Dr. and Mrs. Reed

transferred the following amounts to IRK, which amounts were intended to be either loans to or

contributions to the capital of IRK:

| | |
|---|---|
| October 2, 2008 | $500,000 |
| October 14, 2008 | $200,000 |
| October 21, 2008 | $200,000 |
| October 31, 2008 | $150,000 |
| November 20, 2008 | $250,000 |
| December 29, 2008 | $125,000 |
| January 7, 2009 | $450,000 |
| January 15, 2009 | $1,000,000 |
| February 2, 2009 | $1,000,000 |
| March 9, 2009 | $250,000 |
| April 8, 2009 | $250,000 |
| April 9, 2009 | $45 |
| April 15, 2009 | $400,000 |
| May 5, 2009 | $500,000 |
| May 15, 2009 | $500,000 |
| May 21, 2009 | $20,814 |
| June 18, 2009 | $200,000 |
| June 30, 2009 | $500,000 |
| July 15, 2009 | $500,000 |
| July 20, 2009 | $200,000 |
| July 22, 2009 | $200,000 |
| July 27, 2009 | $350,000 |
| July 30, 2009 | $400,000 |
| November 25, 2009 | $1,000,000 |
| TOTAL | $9,145,859 |

The transfers dating from October 2, 2008 through March 9, 2009 were made by wire transfer to

an account in the name of IRK at HSBC Mexico, S.A. All subsequent transfers were made by

- 4 -

wire transfer to an account in the name of IRK at JP Morgan Chase Bank, N.A.

     18.   In addition, Dr. and Mrs. Reed had paid $1.250 million in order to acquire the shares in IRK formerly owned by Javid Rahman.

     19.   By March of 2009, the documentation regarding Dr. and Mrs. Kuppusamy's and Dr. and Mrs. Reed's investments in IRK included the following:

- Letter of intent February 25, 2009, regarding Asset Transfer and Subscription and Shareholders Agreement which confirms the understanding between KMP Mining, LLC, KMP Mexico, LLC, IRK International, S.A. de C.V. ("IRK"), Mr. Ilangovan Kuppusamy Ammal and Mrs. Ranjani Ilangovan Krishnan.

- Purchase Letter of Intent, dated February 18, 2009, which confirms the mutual understanding between Dr. Presley Reed and Stacey Reed, Dr. Ilangovan Kuppusamy Ammal and Mrs. Ranjani Ilangovan Krishnan and IRK.

- Loan Agreement dated February 25, 2009, entered into by and between IRK as Borrower and KMP International, LLC as Lender.

- Security Agreement dated February 25, 2009, entered into by and between IRK as Borrower and KMP International, LLC as Lender.

- Guarantee Agreement dated February 25, 2009, entered into by between IRK as Borrower and KMP International, LLC as Lender.

- Guarantee Agreement, dated February 25, 2009, entered into by and among

Mr. Ilangovan Kuppusamy Ammal and Mrs. Ranjani Ilangovan Krishnan
as Guarantors, and KMP International, LLC as Lender.

- Public Deed no. 8,981 dated August 14, 2008, which notarizes the General
  Extraordinary Stockholders' Meeting of IRK held June 25, 2008.

- Stock structure certificate of IRK dated February 25, 2009, certifying the
  capital structure of IRK before the preceding transactions.

- Stock Pledge Agreement, dated February 25, 2009, entered into by and
  among Mr. Ilangovan Kuppusamy Ammal and Mrs. Ranjani Ilangovan
  Krishnan as Pledgors, KMP International, LLC as Pledgee, and IRK.

- Stock certificate no. 1 issued in favor of Ranjani Ilangovan Krishnan,
  which represents 245 stocks of the fixed capital of IRK.

- Stock certificate no, 2 issued in favor of Ilangovan Kuppusamy Ammal,
  which represents 245 stocks of the fixed capital of IRK.

- Stock certificate no. 3 issued in favor of Ranjani Ilangovan Krishnan,
  which represents 40,000 socks of the variable capital of IRK.

- Stock certificate issued no. 4 issued in favor of Ilangovan Kuppusamy
  Ammal, which represents 60,000 stock of the variable capital IRK.

- Stock certificate no. 5 issued in favor of Javid Rahman, which represents
  35,000 stocks of the variable capital of IRK.

- Stock certificate no. 6 issued in favor of Ilangovan Kuppusamy Ammal,

which represents 33,000 stocks of the variable capital of IRK.

- Stock certificate no. 8 issued in favor of Ranjani Ilangovan Krishnan, which represents 10,000 stocks of the variable capital of IRK.

- Stock certificate no. 11 issued in favor of Ilangovan Kuppusamy Ammal, which represents 68,000 stocks of the variable capital of IRK.

- Certificate of IRK, dated February 25, 2009, certifying the perfection of the Stock Pledge.

- Floating Borrower Pledge, dated February 25, 2009 entered into by and between IRK as Pledgor and KMP International, LC, as Pledgee.

- Promissory note, dated February 25, 2009, executed by Ilangovan Kuppusamy Ammal and Ranjani Ilangovan Krishnan in favor of KMP international LLC for the amount of $1,500,000.

- Promissory note, dated January 15, 2009, executed by Ilangovan Kuppusamy Ammal and Ranjani Ilangovan Krishnan in favor of Presley Reed for the amount of $2,948,000.

- Promissory note dated February 25, 2009, executed by IRK in favor of KMP International LLC for the amount of $3,000,000.

- Promissory note dated February 25, 2009, executed by IRK in favor of KMP International LLC for the amount of $200,00.

20.    As of May 25, 2010, the shareholders of IRK were as follows:

| | | | |
|---|---|---|---|
| IRK MINERIA, S.A. DE C.V. Representado por: Ilangovan Kupussamy / Ranjani Ilangovan Krishnan | | 52.00% | $5,226,000 |
| KMP Mining, LLC | | 24.00% | $2,412,000 |
| KMP México, LLC | | 24.00% | $2,412,000 |
| | **TOTAL:** | 100.00% | $10,050,000 |

*Investments Made by Trasteel Entities in IRK*

21.    On March 22, 2010, Trasteel Investments Holding SA Luxembourg ("Trasteel Investments") and IRK entered into a Letter of Intent, pursuant to which Trasteel Investments expressed an interest in acquiring 25 percent of the shares of IRK.

22.    Effective as of June 9, 2010, IRK, IRK Mineria, KMP Mining, LLC, KMP Mexico, LLC, and Trasteel Investments entered into a Stock Purchase Agreement (the "Stock Purchase Agreement"). Trasteel Investments SA later assigned its rights and obligations under the Stock Purchase Agreement to Trasteel Belgium SA and Belgiron SA. On August 5, 2010 the First Amendment and Restatement of the Stock Purchase Agreement was entered into between IRK, IRK Mineria, KMP Mining, LLC, KMP Mexico, LLC as sellers and Trasteel Belgium SA and Belgiron SA as purchasers of the stock. According to the First Amendment and Restatement of the Stock Purchase Agreement, Trasteel Belgium and Belgiron would purchase stock of IRK for a total price of US $17,500,000 as follows:

1)    IRK issued 45.448 series B shares to Trasteel Belgium SA in exchange for payment of US $3,500,000 to IRK

2)    363,632 series B shares transferred by the existing shareholders :

- 96,626 shares from IRK Mineria to Trasteel Belgium

- 8 -

- 48,313 shares from KMP Mining to Trasteel Belgium

- 573 shares from KMP Mexico to Trasteel Belgium and

- 218,120 shares to Trasteel Belgium

3)   the balance of US $14,000,000 was to be paid by Trasteel to the Sellers with the following deadlines:

    (a)   US $2,500,000 were to be paid pro rata to the Sellers on the closing date

    (b)   US $2,000,000 were to be paid pro rata to the Sellers on or before September 30, 2010

    (c)   US $2,500,000 were to be paid pro rata to the Sellers on or before December 31, 2010 on the date that the Company had delivered 80 percent of the committed tonnage according to the offtake agreement entered into by the Company and Trasteel International

    (d)   US $3,000,000 were to be paid pro rata to the Sellers on or before March 31, 2011 on the date that the Company had delivered 100% of the committed tonnage according to the offtake agreement entered into by the Company and Trasteel International

    -   USD 4.000.000 were to be kept by Trasteel to secure prompt and complete payment of any amount owed by Seller, including but not limited to indemnifications under the Agreement

23.   Trasteel Investments Holding paid on behalf of Trasteel Belgium a total of US $6,000,000 on the closing date.

24.   Attached to the First Amendment and Restatement of the Stock Purchase

Case 8:14-bk-17399-CB    Doc 47    Filed 02/09/15    Entered 02/10/15 11:05:04    Desc
Case 1:14-cv-02989-RPM    Main Document    Page 10 of 17
Document Filed 1 Page 18 of 26  Colorado    Page 10 of 17

Agreement as exhibits were financial statements of IRK for its fiscal years ending on December 31, 2005 through 2009. The Stock Purchase Agreement also set forth various representations concerning mines, mineral rights, and other related assets in which IRK was said to hold an interest.

25.     The Stock Purchase Agreement required that Trasteel Belgium and Belgiron had the right to appoint the Chief Operating Officer, the Chief Financial Officer and the Fiscal Controller. Immediately after the closing of the transactions described in the First Amendment and Restatement of the Stock Purchase Agreement, Dr. Kuppusamy refused to permit Trasteel Investments' designee for that position to assume any responsibility.

26.     On approximately August 1, 2010, Trasteel Investments and Dr. and Mrs. Reed learned that all IRK assets had been frozen by a Mexican judge due to a legal pending case. In response to an inquiry regarding this situation, Dr. Kuppusamy informed Trasteel that "everything is in order," that this was a personal issue and he was confident that he would be able to solve it. That representation was false.

27.     Within a month after the closing of the Stock Purchase Agreement, it became apparent to Trasteel and Dr. and Mrs. Reed that the financial circumstances of IRK were vastly different from those disclosed in the Stock Purchase Agreement and the First Amendment and Restatement of the Stock Purchase Agreement and that Dr. Kuppusamy had no intention of sharing any accurate information concerning that company's true financial circumstances.

28.     During this period, on information and belief, Dr. Kuppusamy purposely destroyed or removed all corporate records of IRK and its financial affairs. At no relevant time did Dr. Kuppusamy permit any representative of Trasteel or of the Reeds to gain access to IRK's

- 10 -

books and financial records.

29.     On approximately September 27, 2010, Trasteel and Dr. and Mrs. Reed informed Dr. Kuppusamy that they intended to enter into a Master Exiting Agreement pursuant to which Dr. Kuppusamy would be required to repurchase all shares issued or sold to Trasteel Belgium and Belgiron under the First Amendment and Restatement of the Stock Purchase Agreement. Over the course of the following month, Dr. Kuppusamy represented that he would be agreeable to entering into such a Master Exiting Agreement. However, he had no intention of doing so.

30.     In late December of 2010 and early January of 2011, Trasteel and Dr. and Mrs. Reed arranged for their representatives to visit the offices of IRK and to deliver to Dr. Kuppusamy resolutions removing him from any position of authority with IRK. Initially, the receptionist in those offices confirmed that those were in fact the offices of IRK, but subsequently denied that fact, even though other visitors to the same building who stated that they were visiting the IRK offices were granted access. Those same representatives then visited another address that Dr. Kuppusamy had represented to be offices of IRK, but those offices were largely empty, contained furniture but no computers, files, books, and the like, and were staffed only by one person.

31.     That same day, those representatives visited the offices of HSBC Bank and delivered to a representative of that bank board resolutions requesting that all accounts in the name of IRK be frozen. That bank informed those representatives that the total balance of all such accounts was less than $5,000.

32.     On information and belief, IRK currently owns, and has not owned since

- 11 -

2010, any material assets and is and has been since that time, insolvent.

### FIRST CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
*(Conversion)*

33.     Plaintiffs incorporate all previous allegations as if more fully set forth herein.

34.     The direction and control of IRK was at all relevant times under the sole management of Dr. Kuppusamy, such that he was in a position to determine and control whether to devote the assets of IRK to its proper corporate purposes or whether to devote those assets to his personal use.

35.     On July 27, 2010, Dr. Kuppusamy requested that the payment from Trasteel be deposited into "my personal account of Bank of America since I need to workout my taxation of IRK Mineria." On information and belief, to the extent that such payments were deposited into Dr. Kuppusamy's personal account, he never transferred them to an account belonging to or controlled by IRK.

36.     To the extent that Trasteel and Dr. and Mrs. Reed have been able to obtain or recreate statements of IRK's banking activity, those statements disclose a pattern of withdrawals made for no identifiable purpose and payable to no identifiable payee made from IRK's accounts in amounts generally precisely equal to all amounts that Trasteel Investments, Trasteel International and Dr. and Mrs. Reed transferred to IRK. Based on information and belief, there is no legitimate business rationale for any such withdrawals, and all such withdrawals were made solely under the authorization of Dr. Kuppusamy and were diverted to his personal use.

37.    Dr. and Mrs. Kuppusamy's conversion of the corporate assets of IRK has
caused the Plaintiffs' investments in IRK to become worthless and has caused the Plaintiffs to
incur damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### *(Fraudulent Misrepresentation/Omission)*

38.    Plaintiffs incorporate all previous allegations as if more fully set forth
herein.

39.    On November 13, 2009, Dr. Kuppusamy transmitted by email to Dr. and
Mrs. Reed an Excel spreadsheet purporting to identify the status of IRK's ownership or control
over Mexican iron and manganese ore mining properties.

40.    According to its web site (now discontinued, but publicly accessible
throughout 2009), IRK stated that it "is one of the leading mine concession owners of Mexico"
and that it "owns potential reserve of 60 million tons of iron ore, 1.2 million tons of Manganese
ore, 2 million tons of Zinc ore, 200 million tons of Silica quartz, and 14 million tons of Copper
ore in different locations in Mexico though contracts and concession rights for Mining in
Mexico." On information and belief, all such statements were false, Dr. Kuppusamy knew them
to be false, and Dr. Kuppusamy intended nonetheless that Dr. and Mrs. Reed would rely on such
statements for purposes of making their investments in IRK.

41.    Dr. Kuppusamy was aware at the time that virtually all the material
representations and warranties made by IRK in the Stock Purchase Agreement were false when
made and knew that Trasteel Investments and Dr. and Mrs. Reed had relied on those
representations when they invested in the capital stock of IRK.

- 13 -

42.    Dr. and Mrs. Kuppusamy's fraudulent misrepresentations have caused the Plaintiffs to incur damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### *(Contribution)*

43.    In November of 2009, IRK entered into a contract with Fremery Holdings Limited ("Fremery"), a firm carrying on the business of trading in commodities and having its principal place of business at Room 809, North Tower, Concordia Plaza, 1 Science Museum Road, TST, Hong Kong (the "Fremery Contract"). The terms of the Fremery Contract required IRK to deliver 44,000 metric tons of ore having an iron content of at least 63 percent, with a minimum of 62.5 percent, to Fremery.

44.    On November 17, 2009, Dr. Reed executed and delivered to Fremery a Performance Guaranty in which he personally guaranteed all of IRK's obligations under the Fremery contract.

45.    On December 16, 2009, IRK caused a cargo ship to be loaded with iron ore and to set sail for Beilun Port, China. At the time such vessel set sail, Dr. Kuppusamy delivered to Fremery a document purporting to have been executed by SGS Mexico, a Mexican minerals testing firm, certifying that the ore contained in such vessel had an iron ore content of 62.32 percent. On information and belief, the document purporting to have been executed by SGS Mexico was not authentic and had been forged by Dr. Kuppusamy.

46.    Upon its receipt of such document, Fremery caused to be delivered to IRK the sum of $1,171,085.15. On information and belief, Dr. Kuppusamy diverted the entire amount of such payment into his personal account.

- 14 -

47.    Upon the vessel's arrival in Beilun Port, China, and subsequently upon the redelivery of its cargo to a third party in Changzhou, China, Fremery and Dr. Kuppusamy caused that cargo to be tested by two separate inspectors, who certified that the iron ore content of that shipment was 49.28 percent and 49.11 percent, respectively.

48.    In March of 2014, Fremery filed a Statement of Claim with the Hong Kong International Arbitration Centre alleging that Dr. Reed is liable to Fremery under the Performance Guarantee in an amount equal to $2,148,714.84.

49.    To the extent that Dr. Reed is found liable to Fremery for any amount under the Performance Guarantee, such liability is directly attributable to the false representations, falsified documentation, and other fraudulent conduct committed by Dr. Kuppusamy.

50.    Dr. and Mrs. Kuppusamy are liable to Dr. Reed for contribution in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
*(Breach of Contract, Conversion, and Fraudulent Misrepresentation)*

51.    On March 22, 2010, IRK and Trasteel International SA entered into a Sale and Purchase Contract of Iron Ore ("Trasteel Purchase Agreement"), which provided in part that IRK would sell eight cargo loads of iron ore to Trasteel at a price varying between $63 and $68 per ton. Of the eight shipments required under the Trasteel Purchase Agreement, IRK completed only two. In each case, chemical analysis of the ore delivered to the destination port revealed that the iron content was substantially less than that reflected in certificates that IRK caused to be delivered to Trasteel and that purported to establish the iron ore content at the port

- 15 -

of origin. On information and belief, Dr. Kuppusamy falsified the certificates of quality of the ore at the port of origin for the purpose of inducing Trasteel to make payments under the Trasteel Purchase Agreement. Trasteel faced quality issues, demurrage costs and carried out pre-payments for material that was never delivered for a total of USD 5.677.251,59.

52.     On information and belief, Dr. Kuppusamy systematically and secretly withdrew virtually all amounts that Trasteel had paid to IRK pursuant to the Trasteel Purchase Agreement from IRK bank accounts and deposited those amounts in accounts that Dr. Kuppusamy alone controlled. The Plaintiffs are unable to trace such funds beyond their withdrawal from IRK accounts because all banking records relating to the accounts into which such funds were transferred were entirely under the possession and control of Dr. Kuppusamy.

53.     Dr. and Mrs. Kuppusamy's fraudulent misrepresentations and conduct induced Trasteel to enter into the Trasteel Purchase Agreement, as a result of which Dr. Kuppusamy converted to his personal use all amounts that Trasteel paid to IRK under that contract, and therefore Dr. Kuppusamy caused Trasteel to incur damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

54.     Plaintiffs therefore requests the following relief:

A.     That this Court enter judgment against Ilangovan Kuppusamy Ammal and Ranjani Ilangovan Krishman, jointly and severally, and in favor of the Plaintiffs in such amounts as the Plaintiffs may establish at trial to be attributable to the Defendants' breach of contract, conversion, fraudulent misrepresentation, and contribution obligations, plus attorneys' fees, costs and interest;

- 16 -

B.     That this Court order such other and further relief as this Court may deem

proper.

Dated this 3rd day of November, 2014.

/s/ Peter B. Nagel
Peter B. Nagel
Peter B. Nagel, P.C.
999 Eighteenth Street, Suite 1745
Denver, Colorado 80202
Telephone: 303-296-4840
Facsimile: 303-296-6007
Email: pbnagel@rmi.net

Attorney for Plaintiffs:
Presley O. Reed,
Patricia Stacey Reed,
KMP Mining, LLC,
KMP Mexico, LLC,
KMP International, LLC,
Trasteel Belgium Société Anonyme,
Belgiron S.A., and
Trasteel International S.A.

- 17 -

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document entitled (*specify*): _____
Response in Reply to Chapter 7 Trustee's Opposition to DEBTORS' MOTION TO DISMISS CHAPTER 7 Case
_____
_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 02/09/2015_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _02/09/2015_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
Edward Hays, 870 Roosevelt, Irvine, CA 92620
Martin Greenbaum, 840 Newport Center Dr., Suite 720, Newport Beach, CA 92660
Peter B. Nagel, 999 Eighteenth Street, Suite 1745, Denver, Colorado 80202
William Lobel, 840 Newport Center Drive, Suite 750, Newport Beach, CA 92660

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _02/09/2015_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
US Trustee, Bankruptcy court, 411 W 4th ST. Room 9041, Santa Ana, CA 92701 (hand delivery)

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 02/09/2015 | Ilangovan Kuppusamy | |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.